[Cite as *In re Jd.R.*, 2017-Ohio-2940.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

| | | |
|---|---|---|
| In the Matter of: | : | |
| | | **No. 16AP-364** |
| Jd.R., et al., | : | (C.P.C. No. 12JU-5813) |
| (C.R., | : | **(REGULAR CALENDAR)** |
| Appellant). | : | |

———

# D E C I S I O N

**Rendered on May 23, 2017**

———

**On brief:** *James S. Sweeney*, for appellant.

**On brief:** *Robert J. McClaren*, for appellee, Franklin County Children Services.

———

APPEAL from the Franklin County Court of Common Pleas
Division of Domestic Relation, Juvenile Branch

BRUNNER, J.

{¶ 1}  Appellant-mother, C.R., appeals an April 13, 2016 judgment entry from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.  The trial court in its entry granted appellee, Franklin County Children Services ("FCCS"), permanent custody of three of C.R.'s five minor children.  Because we find that the trial court did not abuse its discretion in denying C.R.'s request that the case be continued, and because we find the trial court's decision was appropriately supported by the evidence, we affirm.

## I.  FACTS AND PROCEDURAL HISTORY

{¶ 2}  This Franklin C.P. case, No. 12JU-5813, commenced on April 26, 2012 on FCCS' filing a complaint regarding all four of C.R.'s children then in existence, Jd., Kv., Jy., and Kh.  (Apr. 26, 2012 Compl.)  FCCS alleged in its complaint that C.R. was abusing prescription pain pills and not adequately providing a safe home or food for the children.

No. 16AP-364

*Id.* FCCS also alleged that the two fathers[1] of the four children gave cause for concern related to propensities for domestic violence. *Id.* at 2. The same day the complaint was filed the trial court granted emergency custody to FCCS. (Apr. 26, 2012 Emergency Care Order.) Following hearings on April 27 and July 9, 2012, and with the recommendation of a guardian ad litem for the children, the trial court ordered temporary custody of all four children to FCCS. (July 18, 2012 Decision & Entry on Temporary Custody; May 3, 2012 Guardian ad Litem Report.)

{¶ 3} Following a number of continuances of the case and an extension of temporary custody by the trial court, FCCS moved on September 12, 2013 for permanent custody of all four children. (Sept. 12, 2013 Mot. for Permanent Custody; May 6, 2013 Decision & Entry Extending Temporary Custody.) FCCS alleged in its motion that the children were doing well, having been placed in foster care on December 18, 2012. (Sept. 12, 2013 Mot. for Permanent Custody at 4.) FCCS argued that C.R. had not pursued drug abuse treatment, had taken only 10 out of 97 requested random drug screens, and had produced a positive result in 9 out of the 10 she took. *Id.* at 5.

{¶ 4} After a number of failed attempts to place the children with relatives of the parents and (for one brief period) to give temporary custody of Jd. and Jy. to their father, on March 28, 2016, the trial court convened a hearing to decide the permanent custody motion. *See, e.g.*, Nov. 3, 2014 Temporary Custody Order; Jan 21, 2015 Entry Terminating Custody to T.T. At the outset, the trial court noted that C.R. was present but was serving at that time a sentence of incarceration for convictions for heroin trafficking. (Mar. 28, 2016 Tr. at 7-12.) The trial court denied a motion to continue the case beyond the hearing in order to permit C.R. time to be released from prison and to fashion living arrangements to attempt to serve as an appropriate placement for the children. *Id.*

{¶ 5} The trial court also noted that during the pendency of case No. 12JU-5813, C.R. had given birth to another child, L.R., and that permanent custody of that child was being sought by FCCS in Franklin C.P. No. 14JU-13221. *Id.* at 6. But in that case, when the trial court determined that proper service had not been obtained on the father of L.R., it continued the No. 14JU-13221 case. *Id.* at 74-76. The trial court additionally dismissed

---

[1] Although both fathers contested the permanent custody motion filed by FCCS at points during the trial court proceedings, neither has appealed. Accordingly, recitation of facts relative to their involvement in the children's lives is abbreviated in this decision.

No. 16AP-364

the custody motion of the father of Kv. and Kh. and granted his attorney leave to withdraw. *Id.* at 77-78. Kv. and Kh.'s father was not personally present to prosecute his custody motion, having been indicted for another felony, and he had not sufficiently communicated with his attorney to enable the attorney to represent his interests. *Id.*

{¶ 6} Before addressing contested custody issues in the earlier filed case No. 12JU-5813 case, the trial court addressed a motion by the children's maternal grandmother for custody of Kv. *Id.* at 50-63. It interviewed Kv. in camera. Kv. told the court that living with C.R. was her first choice but, if that were not possible, she would like to live with her grandmother. *Id.* at 28-30. After hearing testimony from Kv.'s grandmother as to her interest in obtaining custody of Kv., and with the agreement of all other interested parties to the suit, the trial court maintained wardship of Kv. but ordered permanent legal custody to her maternal grandmother. *Id.* at 52-63; Mar. 31, 2016 Entry Granting Custody of Kv. Thus, as the contested portion of the hearing commenced, the only case remaining at issue was case No. 12JU-5813 with the hearing focused on resolving custody issues for Jd., Jy., and Kh.

{¶ 7} The trial court conducted in camera interviews of both Jd. and Kh.[2] Jd., almost age ten at the time of the interview, told the trial court judge that he preferred to reside with his mother, C.R. (Mar. 28, 2016 Tr. at 16.) However, if that was not possible, he wanted to live with his foster family. *Id.* Kh., who was approximately four and one-half at the time of the interview, had less understanding of the nature of the proceedings. However, she was clear that she wanted to stay with her foster family (which also had temporary custody of Jy. and L.R.) "forever." *Id.* at 35-38.

{¶ 8} During the three-day hearing, four other witnesses testified: Erinn Anderson (the caseworker for the case), Vicki Rush (the children's guardian ad litem), T.T. (father of Jd. and Jy.),[3] and C.R.

{¶ 9} Anderson testified that she had been the caseworker for C.R.'s family since November 28, 2011. *Id.* at 173-74. She confirmed what the docket filings show, that FCCS first received emergency custody of the children on April 27, 2012 and temporary custody

---

[2] The trial court did not conduct an in camera interview of Jy. because of Jy.'s young age and Down's syndrome condition, and she was considered to be verbally unable to express her wishes. *See e.g.*, Mar. 29, 2016 Tr. at 102.

[3] While T.T. contested the permanent custody motion by FCCS at the trial level, T.T. did not appeal and we thus limit discussion of his testimony and arguments before the trial court.

following a hearing on July 9, 2012. *Id.* at 176-77. The case plan required C.R. to complete an alcohol and drug assessment, follow through with treatment recommendations, complete random urine screens, maintain housing, acquire legal income, and link with designated programs including ones that addressed Jy.'s special needs. *Id.* at 177-78. Kh. had been born opiate positive, indicating C.R.'s need for alcohol and drug assessment and treatment. *Id.* at 178. But C.R. did not pursue testing and treatment despite being given referrals to appropriate treatment centers. *Id.* at 178-80. During the full course of the case, C.R. completed just 21 of 230 requested random drug screens with the last one occurring on September 12, 2014. *Id.* at 180-81. Although Anderson testified that C.R. maintained consistent employment throughout the case, it did not provide C.R. with sufficient income to raise five children. *Id.* at 187-88. She did not have stable housing outside of incarceration, as was her status at the time of the hearing. *Id.* at 185-87.

{¶ 10} Though Anderson testified that the children seemed fond of their mother and that visits with C.R. generally went well, there were long periods (mainly due to incarceration) when C.R. did not visit her children. *Id.* at 189; Mar. 29, 2016 Tr. at 62-63. In Anderson's judgment, only the oldest of C.R.'s children, Jd., had a real relationship with C.R.; the others had spent the majority of their lives in foster care. (Mar. 28, 2016 Tr. at 191-92.) Anderson observed that C.R. was challenged during visits with the five of them and had trouble managing and paying enough attention to all of them when they were together. *Id.* at 188, 190-91.

{¶ 11} Anderson testified that Jd. had been placed in homes other than C.R.'s 12 times since FCCS had been involved with the family. (Mar. 29, 2016 Tr. at 33-34.) She explained that Jd. had been in his current placement since January 20, 2015, when his father returned him to the custody of FCCS shortly after receiving temporary custody. *Id.* Anderson testified that Jd. had an excellent relationship with his current foster parents, "Momma Dee" and "Momma Tabs," and they planned to adopt him if the trial court granted permanent custody to FCCS. *Id.* at 35.

{¶ 12} Jy. and Kh. have experienced six and seven placements, respectively, during their time in the FCCS system. *Id.* at 36. Anderson stated that both had been in their current placement since July 31, 2013 with the exception of a brief interval in which Jy.

No. 16AP-364

was placed with her father. *Id.* at 37. The relationship with their foster family was very good. *Id.* at 38. Jy. and Kh. were bonded to each other and their foster mom and dad whom they referred to as "Mom" and "Dad." *Id.* At the time of the hearing the other child, L.R., was also placed with that foster family. *Id.* at 39. Anderson reported that the foster family wished to adopt all three of the children if permanent custody were granted to FCCS. *Id.* Anderson also noted that the foster family would be open to keeping the siblings in touch with Jd. even if he were placed in a different household. *Id.* at 39-41.

{¶ 13} Anderson stated that although C.R. testified that she was clean at the time of the hearing, she never completed treatment or established that fact through regular drug screens. *Id.* at 91. Having been the family's caseworker since FCCS' involvement in 2012, Anderson stated that she did not believe C.R.'s persistent challenges due to drugs, lack of stable housing, and lack of sufficient employment to provide for five children would change whether or not she was incarcerated. *Id.* Accordingly, Anderson recommended permanent custody be granted to FCCS. *Id.* at 42-43.

{¶ 14} The guardian ad litem, Vicki Rush, testified that she had been the guardian for the children since May 19, 2015. *Id.* at 93. She stated that visits with C.R. were often somewhat chaotic. *Id.* at 94-95. She, too, stated that Jd. had a good relationship with both of his foster mothers, and she corroborated what Jd. had told the trial court in camera that he wanted to reside with C.R. but if he could not, would like to be adopted by his foster family. *Id.* at 98-100. Rush likewise corroborated that Kh. wished to stay with her foster parents. *Id.* at 101-02. Rush said that Jy. could not properly express herself but her behavior had led Rush to believe that she wished to stay with her foster parents. *Id.* Rush also testified that the children were all in prospective adoption placements with foster parents who wanted to adopt. *Id.* at 128.

{¶ 15} C.R. appeared and testified during the hearing. She admitted that she was incarcerated at the time of the hearing for two fifth-degree felony convictions of heroin trafficking. (Mar. 28, 2016 Tr. at 85.) She clarified that her original sentence for these convictions was to successfully complete "intervention in lieu of conviction."[4] She had been sentenced to prison for failing to complete the program. *Id.* at 87. Her "out date" from prison was to be June 29, 2016, three months after her testimony, because she had

---

[4] *See* R.C. 2951.041.

qualified for a Treatment Transfer Program that authorized early prison release directly into inpatient treatment for a number of weeks (8 to 10, possibly more). *Id.* at 89-90; (Mar. 29, 2016 Tr. at 140-42). C.R. testified that she had not used drugs while in prison and that she had been attending 12-step meetings while in prison. (Mar. 28, 2016 Tr. at 101, 120.)

{¶ 16} C.R. did acknowledge that her children had been removed from her house on April 26, 2012 and never returned because she abused and trafficked in drugs *Id.* at 90-92. She admitted that she never finished a treatment plan though she started twice. *Id.* at 94-96. She confirmed that she had not submitted to a drug screen for two and one-half years, since September 2014. *Id.* at 96-97. She at first attributed this to having been incarcerated for eight months. *Id.* But she admitted that she did not submit to drug screening when she was pregnant with L.R. The excuse she gave was being angry that FCCS had taken her child on the conclusion that she was still abusing drugs, which she denied. *Id.* She claimed to have taken only what the hospital had given her. *Id.* She also offered an excuse for failing to show for drug screening that a warrant had been issued for her arrest and the drug screening location was near a police station; again she asserted she had been sober anyway. (Mar. 29, 2016 Tr. at 151-52.) She also excused her failure to drug screen on her inability to find transportation even though she acknowledged she generally found transportation to visits with her children and that FCCS had given her bus passes. *Id.* at 152-54; Mar. 28, 2016 Tr. at 117-18. C.R. also claimed unspecified health issues had prevented her from being accepted for treatment with one provider. (Mar. 28, 2016 Tr. at 100.)

{¶ 17} C.R. testified that when she was released from prison (and presumably after completing inpatient treatment) she planned to move into an apartment her sister had obtained for her and begin a job earning $70 per day as a mover with a company owned by a friend. *Id.* at 106-07. She admitted that a job moving furniture might not be ideal since her initial opiate addiction began in part out of the use of pain killers to treat scoliosis. (Mar. 29, 2016 Tr. at 155-56.) C.R. testified that she had good earning potential as a college graduate (with a degree as a medical assistant). *Id.* at 135. However, she also testified that she was in GED classes at the prison because, although she maintained that she had previously obtained a GED, she said the records had been lost. *Id.* at 137-39. She

No. 16AP-364

testified that she had consistent employment in fast food, warehousing, babysitting, and cleaning. *Id.* at 136. She said she planned to get a bigger house for her and her kids. *Id.* at 134-35. Although she acknowledged that she could not care for her children while incarcerated and addicted to drugs, she expressed confidence that she would be able to when she was released and that they would all "just have a blast." *Id.* at 147.

{¶ 18} She confirmed that her relationship with her kids was good but suggested that some of the problems were the result of FCCS intervention. *Id.* at 143-49. She admitted that the foster family that had custody of Kh., Jy., and L.R. was providing a good home for them. *Id.* at 156-57. However, she said she believed that Jd. would not turn out to be a good person if she were not allowed to have custody of him. *Id.* at 163.

{¶ 19} Following the hearing, the trial court granted FCCS' permanent custody motion. (April 13, 2016 Jgmt. Entry.) C.R. now appeals.

## II. ASSIGNMENTS OF ERROR

{¶ 20} C.R. asserts two assignments of error for our review:

> [1.] THE TRIAL COURT'S FINDING THAT FCCS' MOTION FOR PERMANENT CUSTODY WAS SUPPORTED BY CLEAR AND CONVINCING EVIDENCE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE
>
> [2.] THE TRIAL COURT ABUSED ITS DISCRETION BY DENYING APPELLANT C.R.'S MOTION FOR A CONTINUANCE

## III. DISCUSSION

### A. Second Assignment of Error—Whether the Trial Court Abused its Discretion in Denying C.R. a Continuance to Permit her to be Released from Prison and Complete her Case Plan

{¶ 21} At the outset of the hearing on granting permanent custody of C.R.'s children to FCCS, C.R. moved for a continuance of unspecified length to permit her time to be released from prison and complete treatment through an inpatient program. (Mar. 28, 2016 Tr. at 7-8.) FCCS and the guardian ad litem opposed the motion on the grounds that C.R. had already had years in which to complete her case plan and seek treatment and had not done so. *Id.* at 8-10. In addition, they argued that the inpatient program could be lengthy, might not even commence for over a month, and that the children needed permanence. *Id.* The remaining parties to the case supported the

continuance. *Id.* at 10-12. The trial court denied the continuance on several grounds: the children had been waiting a long time already, the permanent custody motion had been pending for years, there was no clarity about how long the continuance would be (it could have been lengthy), and the case had been delayed long enough. *Id.* at 12. In short, the trial court found that the interests of the children in seeing the case concluded with permanency outweighed C.R.'s interest in having yet another opportunity to complete her case plan. *Id.* C.R. now argues that the trial court abused its discretion in reaching this conclusion.

{¶ 22} "The grant or denial of a continuance is a matter which is entrusted to the broad, sound discretion of the trial judge." *State v. Unger*, 67 Ohio St.2d 65, 67 (1981). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied." *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

> In evaluating a motion for a continuance, a court should note, inter alia: [1] the length of the delay requested; [2] whether other continuances have been requested and received; [3] the inconvenience to litigants, witnesses, opposing counsel and the court; [4] whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; [5] whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and [6] other relevant factors, depending on the unique facts of each case.

*Unger* at 67-68; *see also, e.g.*, *State v. Lauer*, 10th Dist. No. 15AP-405, 2016-Ohio-505, ¶ 16. In examining the evidence before the trial court according to the factors set forth by *Unger*, it is apparent that the trial court did not abuse its discretion.

{¶ 23} The delay requested by C.R. would likely have been lengthy. She essentially sought yet another opportunity to "show the Court that she [could] be successful in [] treatment." (Mar. 28, 2016 Tr. at 8.) In order to meet that goal she would have needed to be released from prison and then complete at least an inpatient treatment program. Her release date may have been in late June or April depending on whether C.R.'s view of the programs was correct or not. *Id.* at 89. But even by C.R.'s testimony, the inpatient treatment (constituting a period during which she would not be allowed to have her

children) would have been at least eight to ten weeks and there was to be another round of treatment after that. (Mar. 29, 2016 Tr. at 149-51.)

{¶ 24} Numerous other continuances had already occurred in the case. The family's case had been continued 12 times, at least half of which were at the request of C.R. (sometimes joined by other parties). (Apr. 24, 2013 Cont.; Oct. 23, 2013 Cont.; Nov. 26, 2013 Cont.; Jan. 13, 2014 Cont.; Mar. 31, 2014 Cont.; June 16, 2014 Cont.; Nov. 3, 2014 Cont.; Jan. 21, 2015 Cont.; Mar. 3, 2015 Cont.; Apr. 27, 2015 Cont.; June 9, 2015 Cont.; Nov. 4, 2015 Cont.)

{¶ 25} Although most parties did not oppose C.R.'s motion, the children were left with the uncertainty of having to wait still longer for a resolution of what was to be each child's permanent situation. The trial court recognized this as a significant concern. (Mar. 28, 2016 Tr. at 12.) We agree that this is a legitimate basis on which the trial court could exercise its discretion and deny C.R.'s request for continuance.

{¶ 26} C.R. unquestionably contributed to the circumstances that made the continuance request necessary. She repeatedly failed to submit to drug screens, complete treatment, or complete her case plan when she could have chosen to comply. (Mar. 28, 2016 Tr. at 94-97, 177-87; Mar. 29, 2016 Tr. at 91, 94-96.) She failed to abstain from drug trafficking which led to her indictment for two felony counts of heroin trafficking. (Mar. 28, 2016 Tr. at 85.) When she failed to complete the intervention in lieu of conviction plan, which would have allowed her to avoid conviction and imprisonment for her crimes (*id.* at 87), C.R.'s priorities became clear.

{¶ 27} The trial court did not abuse its discretion in denying the continuance. C.R.'s second assignment of error is overruled.

### B. First Assignment of Error—Whether the Trial Court Erred Granting Permanent Custody of Jd., Jy., and Kh. to FCCS

{¶ 28} When proceeding under R.C. 2151.414(B)(1), a decision to award permanent custody requires the trial court to take a two-step approach. First, the trial court must find whether any of the following apply:

> (a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children

No. 16AP-364

services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

R.C. 2151.414(B)(1)(a) through (e).

{¶ 29} Once the trial court finds that one of these circumstances applies, the trial court then must determine whether, "by clear and convincing evidence," the movant has shown that a grant of permanent custody is in the "best interest of the child." R.C. 2151.414(B)(1). Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established. *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt. *Id.*

{¶ 30} In C.R. and her children's case, it is undisputed that her children were in the custody of the agency for 12 months out of a consecutive 22-month period in accord with

No. 16AP-364

division (B)(1)(d) of R.C. 2151.414. (Jan. 13, 2017 C.R. Brief at 7.) This shifts the analysis to whether the trial court had before it clear and convincing evidence to determine that it was "in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody." R.C. 2151.414(B)(1). R.C. 2151.414(D) sets forth relevant factors to consider in determining the best interests of the children:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state;
>
> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e). The additional factors referenced in R.C. 2151.414(D)(1)(e) are:

> (7) The parent has been convicted of or pleaded guilty to one of [a number of offenses apparently inapplicable in this case].
>
> (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by

spiritual means through prayer alone in accordance with the tenets of a recognized religious body.

(9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.

(10) The parent has abandoned the child.

(11) The parent has had parental rights involuntarily terminated with respect to a sibling of the child pursuant to this section or section 2151.353 or 2151.415 of the Revised Code, or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to those sections, and the parent has failed to provide clear and convincing evidence to prove that, notwithstanding the prior termination, the parent can provide a legally secure permanent placement and adequate care for the health, welfare, and safety of the child.

R.C. 2151.414(E)(7) through (11). The trial court considered all of these factors in reaching its conclusion that it was in the best interest of C.R.'s children that FCCS be awarded permanent custody of her children.

{¶ 31} In reviewing a trial court's decision that the statutory elements are satisfied in a permanent custody case, a trial court's determination will not be reversed unless it is against the manifest weight of the evidence. *In re Andy-Jones*, 10th Dist. No. 03AP-1167, 2004-Ohio-3312, ¶ 28. " 'Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence.' " *In re K.M.*, 10th Dist. No. 15AP-64, 2015-Ohio-4682, ¶ 14, quoting *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8.

### 1. Factor (D)(1)(a)—Relationship Between Children and Biological Mother, Siblings, and Foster Parents

{¶ 32} The caseworker, Anderson, testified that the children seemed fond of their mother and that visits with C.R. generally went well. (Mar. 29, 2016 Tr. at 62-63.) However, Anderson testified that C.R. was challenged during visits with her children in

paying sufficient attention to all five children or managing them, and she often raised her voice when trying to do so. (Mar. 28, 2016 Tr. at 188-91.) There were also long periods (mainly due to incarceration) in which C.R. did not visit her children. *Id.* at 189. In Anderson's judgment, only the eldest child, Jd., had a real relationship with C.R., owing to the fact that the other children had spent the majority of their lives in foster care. *Id.* at 191-92. C.R. confirmed that her relationship with her kids was good and that her kids call her "mom" and run to her "with open arms and open heart." (Mar. 29, 2016 Tr. at 143.) Her testimony indicated a belief that to the extent there are problems with the relationships they are the result of FCCS intervention. *Id.* at 143-49.

{¶ 33} Caseworker Anderson testified that the eldest, Jd., had been in his current placement since January 20, 2015, when his father returned him to the custody of FCCS shortly after receiving temporary custody. (Mar. 29, 2016 Tr. at 33-34). Anderson testified that Jd. had an excellent relationship with his current foster family, whom he called Momma Dee and Momma Tabs, and that they planned to adopt him in the event that the trial court granted permanent custody to FCCS. *Id.* at 35. Anderson said that Jy. and Kh. had been in their current placement since July 31, 2013 with the exception of a brief interval in which Jy. was placed with her father. *Id.* at 37. Jy.'s and Kh.'s relationship with their foster family was very good. *Id.* at 38. The two children were bonded with one another and with their foster mom and dad whom they referred to as mom and dad. *Id.* At the time of the hearing the other child, L.R. was also placed with Jy.'s and Kh.'s foster family. *Id.* at 39. Anderson testified that the foster family wished to adopt all three of the children if permanent custody were granted to FCCS. *Id.* Anderson also testified that the foster family would be open to keeping the siblings in touch with Jd. although he would be placed in a different household. *Id.* at 39-41.

{¶ 34} The trial court's discussion on this factor reflects competent, credible evidence from the transcript and other evidence in the record. (April 13, 2016 Jgmt. Entry at 9-12.) The trial court's findings on this factor were not against the manifest weight of the evidence.

### 2. Factor (D)(1)(b)—The Wishes of the Children

{¶ 35} The trial court's decision reflects that it interviewed the children who were capable of expressing themselves and the interviews are part of the record. (Apr. 13, 2016 Jgmt. Entry at 13.) Jd., who was almost ten at the time of the interview, told the trial

court judge that his first preference was to reside with his mother, C.R. (Mar. 28, 2016 Tr. at 16.) However, if that was not possible, he stated that he wanted to live with his foster family. *Id.* Kh., who was approximately four and one-half at the time of the interview, had less of a grasp of the nature of the proceedings. However, she was clear that she wanted to stay with her foster family "forever," which also was fostering Jy. and L.R. *Id.* at 35-38.

{¶ 36} The guardian ad litem's testimony corroborated what Jd. had expressed to the trial court in his in camera interview that he wanted to reside with C.R. but if he could not, would like to be adopted by his foster family. (Mar. 29, 2016 Tr. at 99-100.) The guardian ad litem likewise corroborated Kh.'s wishes, explaining that Kh. wished to stay with her foster parents. *Id.* at 101-02. The guardian ad litem testified that Jy. could not sufficiently express herself, but from what she had observed of Jy.'s behavior, she believed that Jy. wished to stay with her foster parents. *Id.*

{¶ 37} The trial court's decision is based on competent and credible evidence from the record that clearly and convincingly are not against the manifest weight of the evidence as to this factor.

### 3. Factor (D)(1)(c)—The Children's Custody History

{¶ 38} From April 26, 2012 when C.R.'s children were removed from her home, until the hearing at the end of March 2016, the children were in the custody of FCCS and lived in a variety of placements. (FCCS Ex. 10.) The only exception to this was a period from November 3, 2014 to January 21, 2015, when the trial court ordered that T.T. had temporary custody of Jd. and Jy. before returning them to FCCS on January 17, 2015, having made the self-determination he was incapable of taking care of the children. (Nov. 3, 2014 Temporary Custody Order; Jan 21, 2015 Entry Terminating Temporary Custody to T.T.; Jan. 21, 2015 Findings of Fact & Law.)

{¶ 39} The record shows that the trial court convincingly and clearly found from competent and credible evidence before it that the children's history with the agency supported a finding that it was in the children's best interest on this factor to grant the motion for permanent custody.

No. 16AP-364

### 4. Factor (D)(1)(d)—The Children's Need for Secure Placement and Whether that Can be Achieved without Granting Custody to FCCS

{¶ 40} At the time of the hearing, Jd., Jy., and Kh. had been in the temporary custody of FCCS (with one short break for Jd. and Jy.) since April 26, 2012, almost 4 years. (FCCS Ex. 10.) Ten-year-old Jd. had experienced 12 placements during his involvement with FCCS constituting nearly half his life. (Mar. 29, 2016 Tr. at 33-34.) Jy. and Kh., who are even younger than Jd., had lived in 6 and 7 placements respectively during their time in FCCS' temporary custody. *Id.* at 36. For Kh., who was just 4 and one-half, she had virtually never known anything but temporary placements. By the time of the hearing in 2016, the record showed that C.R.'s children needed a secure placement as their home and family environment.

{¶ 41} The trial court determined that placement with the fathers of these children was not appropriate and those findings have not been appealed. (Apr. 13, 2016 Jgmt. Entry at 16-17.) The analysis for this factor centers on whether C.R. could have served the children's need for secure placement.

{¶ 42} C.R. did not ever complete both drug abuse assessment and treatment, although she was referred throughout the course of this case to various treatment centers. (Mar. 28, 2016 Tr. at 178-80.) During the 4 years of the case before the trial court, C.R. completed just 21 of 230 requested random drug screens with the last one occurring on September 12, 2014. *Id.* at 180-81. She gave divergent explanations for why she failed to complete treatment or regularly submit to drug screens—blaming her failure on being incarcerated, on being angry at FCCS' allegedly untrue insistence that she was abusing drugs, on fear of being arrested on a warrant, on her inability to obtain transportation (despite clear indications in the record of help available from FCCS), and even on the treatment center itself allegedly turning her away for unspecified health concerns. (Mar. 28, 2016 Tr. at 96-97, 100, 117-18; Mar. 29, 2016 Tr. at 151-54.) Although C.R. was consistently employed (albeit in a variety of short-term occupations), the occupations did not provide sufficient income for C.R. to care for her children. (Mar. 28, 2016 Tr. at 188.) C.R. was incarcerated at the time of the hearing but made representations that her sister had found an apartment for C.R. and her children. The trial court apparently found the prospects of the apartment being available on both C.R.'s release from prison and her

completing a subsequent required course of drug treatment (part of the program for early prison release) were not credible. *Id.* at 185-87.

{¶ 43} C.R. testified that once out of prison she would complete treatment and things would change, but her testimony about how she would accomplish all necessary to provide a secure placement for her children was inconsistent. C.R. testified that after her release from prison, she foresaw herself getting a large home that would accommodate her, her mom, and her five children. (Mar. 29, 2016 Tr. at 134-35.) But she also testified that upon her release she planned to move into an "affordable apartment" and work moving furniture for $70 per day (despite having abused pain pills prescribed for scoliosis and later the illegal drug of heroin). (Mar. 28, 2016 Tr. at 106-07; Mar. 29, 2016 Tr. at 155-56.) C.R. also testified in response to the question, "Do you -- do you feel like you're at a place mentally and with your addiction that you could parent your children?":

> A. Where I'm at now? No. But when I get out, absolutely. I know that I could take all five of my children home and know that I would just have a blast with them. Going outside playing 'cause (sic) I am ADHD as well and I have a lot of energy and I just love my children so much.

(Mar. 29, 2016 Tr. at 147.) The FCCS caseworker testified that most of C.R.'s children hardly knew her because they were so young when the case began and they were removed from her home. (Mar. 28, 2016 Tr. at 191-92.) The eldest, Jd., was five at the time of the initial removal, and Jy. and Kh. were approximately one and one-half years and six-months, respectively when the case began. (Apr. 26, 2012 Compl. at 1.)

{¶ 44} As for other potential permanent placements, the potential pool consisted of C.R.'s sister and mother. Yet even by C.R.'s own admission, her sister could not take the children long-term and her mother was only willing to take (and did, in fact, take) custody of Kv. (Mar. 28, 2016 Tr. at 119.)

{¶ 45} The evidence showed that the foster parents of Jd., Jy., and Kh. were ready and willing to adopt them if permanent custody were awarded to FCCS and that the children were amenable and even favorable to this. *Id.* at 16, 35-38; Mar. 29, 2016 Tr. at 35, 39, 128.

{¶ 46} The trial court clearly and convincingly found, based on competent and credible evidence on this factor, that the children were in need of legally secure

No. 16AP-364

permanent placement that could not be achieved without granting permanent custody to FCCS.  We find that the trial court's decision on this statutory factor was not against the manifest weight of the evidence.

### 5.  Factor (E)(7)—Convictions of Parents

{¶ 47}  There was no evidence that any parent committed any of the relevant offenses in this case.  Thus, the trial court correctly accorded this factor no weight.

### 6.  Factor (E)(8)—Withholding Food or Medical Treatment

{¶ 48}  Our review of the record shows the trial court correctly determined that this factor plays no role in this case.

### 7.  Factor (E)(9)—Risk of Harm from Drug or Alcohol Abuse

{¶ 49}  There was evidence that C.R. twice began and failed to ever finish drug treatment as required by her case plan and as contemplated in R.C. 2151.414(E)(9).  (Mar. 28, 2016 Tr. at 94-96, 178-80.)  However, no evidence was presented at the hearing on the direct topic of whether C.R. "placed [any of her children] at substantial risk of harm two or more times due to alcohol or drug abuse." R.C. 2151.414(E)(9).  Consequently, the trial court was correct in failing to make any finding on this factor.

### 8.  Factor (E)(10)—Whether the Children have been Abandoned

{¶ 50}  C.R. has contested this case and relatively consistently visited the children, except during occasions in which she was hospitalized or incarcerated.  (Mar. 28, 2016 Tr. at 107-11, 189.)  Hence, C.R. has not abandoned the children and the trial court was correct in not concluding that she had.

### 9.  Factor (E)(11)—Whether Parents have had Parental Rights Involuntarily Terminated with Respect to a Sibling of the Children

{¶ 51}  The record in this case reflects that C.R. acquiesced in her mother taking custody of Kv. during the hearing.  (Mar. 28, 2016 Tr. at 60-62.)  However, the record does not clearly show that this was an involuntary termination of rights in the manner intended by R.C. 2151.414(E)(11).  Thus, the trial court was correct to conclude that on the record before it, this factor did not play a role.

### 10. Overall Weighing of the Factors and the Best Interest of the Children

{¶ 52}  The evidence showed that the relationship between C.R. and her children (except for Jd.) was superficially good but limited in depth due to the fact that the

children have been in the system rather than with her for most of their lives. As for Jd., the oldest, he wanted to live with his mother, but he was agreeable to being adopted. The other children's first preference (to the extent it could be expressed) was to be adopted. The children's lengthy custody history and number and variety of placements showed a need for permanence of legal placement. This included the trial court's consideration of competent and credible evidence in this regard and that supported its finding that other relatives of the children (other than grandmother who was only able to take Kv.), were unsuitable for the children's needs. The evidence clearly and convincingly supports the trial court's conclusion that FCCS was the only practical option for the children's secure placement.

{¶ 53} Accordingly, we find that it was not against the manifest weight of the evidence for the trial court to have determined that it was in the children's best interest to be placed permanently with FCCS when considering the factor of their secure placement.

{¶ 54} Overall, the trial court discussed and considered each factor in light of the evidence before it and did not err in its recitation on any individual factor. Nor did the trial court err in considering and weighing the evidence before it as to each factor when it reached the ultimate decision that it is in the best interests of the children to deny their mother any further permanent custody of them. Accordingly, C.R.'s first assignment of error is overruled.

## IV. CONCLUSION

{¶ 55} The trial court did not err in failing to grant a continuance to C.R. to permit her to be released from prison, attend treatment, and work her case plan given that the case had been ongoing for 4 years, had been continued 12 times, and C.R. had already had ample opportunity to complete her case plan and yet had barely started. The trial court's decision to grant permanent custody of Jd., Jy., and Kh. to FCCS was clearly and convincingly based on competent, credible evidence and not against its manifest weight. Accordingly we overrule both of C.R.'s assignments of error and affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

KLATT and DORRIAN, JJ., concur.

————————————